**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

HELEN B. ORTEGA,

      Plaintiff,

v.                                        CIV 05-0862 LAM

JO ANNE B. BARNHART,
Commissioner, Social Security Administration,

      Defendant.

# MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff's *Motion to Reverse Administrative Decision or, in the Alternative, a Remand of Said Decision* (*Doc. 9*) filed on January 30, 2006.  In accordance with 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(b), the parties have consented to having the undersigned United States Magistrate Judge conduct all proceedings and enter final judgment in this case.  The Court has reviewed Plaintiff's motion and the memorandum in support of the motion (*Doc. 10*), Defendant's response to the motion (*Doc. 13*), Plaintiff's reply to the response (*Doc. 17*), and relevant law.  Additionally, the Court has meticulously reviewed and considered the entire administrative record (hereinafter "*Record*" or "*R*.").  For the reasons set forth below, the Court **FINDS** that Plaintiff's motion should be **DENIED** and the decision of the Commissioner of Social Security (hereinafter "Commissioner") **AFFIRMED**.

## I.  Procedural History

On June 18, 2002, Plaintiff, Helen B. Ortega, applied for Disability Insurance Benefits. *R. at 44.*  In connection with her application, she alleged a disability since April 1, 1999. *R. at 44, 52.*

In connection with her application, Plaintiff alleged a disability due to rheumatoid arthritis. *R. at 52*. There is also evidence in the *Record* that Plaintiff suffered from breast cancer that was successfully treated without recurrence. *R. at 197*. Plaintiff's application was denied at the initial *(R. at 22, 24-27)* and reconsideration levels *(R. at 23, 30-34)*.

An administrative law judge (hereinafter "ALJ") conducted a hearing on July 7, 2004. *R. at 339-363*. Plaintiff was present and testified at the hearing. *R. at 342-355 and 358-360*. Plaintiff was represented by counsel at the hearing. *R. at 339, 341*. On August 20, 2004, the ALJ issued his decision in which he found that Plaintiff was not disabled at step five of the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520. *R. at 11-20*. The ALJ made the following findings, *inter alia*, with regard to Plaintiff: (1) she met the nondisability requirements for a period of disability and Disability Insurance Benefits and was insured for benefits through the date of the decision; (2) she had not engaged in substantial gainful activity since the alleged onset of disability; (3) she has a "severe" impairment pursuant to the requirements in 20 C.F.R. § 404.1521;[1] (4) this medically determinable impairment did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4; (5) her allegations regarding her impairment, while generally credible, did not support a finding of disability; (6) she has the residual functional capacity (hereinafter "RFC") to perform a significant range of light work that allows for a sit/stand option;[2] (7) she is unable to perform any of her past relevant work; (8) she is an "individual

---

[1]The ALJ found that Plaintiff had the severe impairment of rheumatoid arthritis. *R. at 16, 19*. Under relevant Social Security regulations, an impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §404.1521.

[2]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do

closely approaching advanced age"; (9) she has "more than a high school (or high school equivalent) education"; (10) she has no transferable skills from semi-skilled work previously performed; (11) while her exertional limitations do not allow her to perform the full range of light work, but there are a significant number of jobs in the national economy that she could perform; and (12) she had not been under a "disability" as defined in the Social Security Act, at any time through the date of the decision.  *R. at 19-20.*

After the ALJ issued his decision, Plaintiff filed a request for review.  *R. at 8-10.*  On July 12, 2005, the Appeals Council issued its decision denying her request and upholding the decision of the ALJ.  *R. at 4-7.*  On August 12, 2005, Plaintiff filed her complaint in this action. (*Doc. 1.*)

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied the correct legal standards. *See Hamilton v. Sec'y. of Health & Human Services*, 961 F.2d 1495, 1497-1498 (10th Cir. 1992). If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief.  *See, e.g., Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).  This Court's assessment is based on a meticulous review of the entire record, where the Court can neither re-weigh the evidence nor substitute its judgment for that of the agency.  *See Hamlin*, 365 F.3d at 1214; *see also Langley*, 373 F.3d at 1118. "Substantial evidence" means "such relevant evidence as a reasonable mind might

---

sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118 (citation and quotation omitted); *see also Hamlin*, 365 F.3d at 1214; *Doyal*, 331 F.3d at 760.  An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118 (citation and quotation omitted); *see also Hamlin*, 365 F.3d at 1214.  While the Court may not reweigh the evidence or try the issues *de novo,* its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citations omitted).

For purposes of disability insurance and supplemental security income benefits, a person is considered to be disabled if he or she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 [twelve] months."  42 U.S.C. § 423(d)(1)(A) and 42 U.S.C. § 1382c(a)(3)(A), respectively.  A five-step sequential evaluation process has been established for evaluating a disability claim.  *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§ 404.1520 and 416.920.  At the first four levels of the sequential evaluation process, the claimant must show that he is not engaged in substantial gainful activity; that he has a medically severe impairment or combination of impairments; and that either his impairment(s) meet or equal one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Pt. 404, Subpt. P, App. 1,[3] or that he is unable to perform his past relevant work.  *See Grogan v. Barnhart,* 399 F.3d at 1261 (10th Cir. 2005);

---

[3]If a claimant can show that his impairment meets or equals a listed impairment, and also meets the duration requirement in 20 C.F.R. §§ 404.1509 and 416.909 (requiring that an impairment have lasted or be expected to last for a continuous period of at least twelve months), he will be found disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 1520(d), and §§ 416.920(a)(4)(iii) and 920(d).

20 C.F.R. § 404.1520(a)(4).  At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work, considering his RFC, age, education, and work experience.  *Id.*

### III.  Plaintiff's Age, Education, Work Experience and Medical History

Plaintiff was fifty-two years old on the date of the ALJ's decision.  *R. at 44, 343.*  She completed twelfth grade and one year of college.  *R. at 58.*  Plaintiff had training as a nurses aide and in computer accounting.  *R. at 58.*  Plaintiff has past work experience as an office clerk, data entry clerk and secretary.  *R. at 53, 344-345.*

Plaintiff's medical records indicate that Thomas B. Ramage, M.D. treated her for rheumatoid arthritis as early as February 11, 1998.  *R. at 188.*  The medical records provide evidence that Plaintiff was treated for rheumatoid arthritis on a regular basis by Dr. Ramage from February, 1998 through May 10, 2004.  The last treatment notes from Dr. Ramage are dated March 3, 2003.  *R. at 302.*  However, there are subsequent laboratory reports, through May 10, 2004 *(R. at 330-338)*, from Covenant Healthcare Center in Roswell, New Mexico that indicate the tests were ordered by Dr. Ramage; therefore, the Court concludes that Plaintiff continued her treatment with Dr. Ramage through May 10, 2004.

Over the course of treatment, Dr. Ramage continually monitored Plaintiff's rheumatoid arthritis by checking her sedimentation rate[4] (erythrocyte sedimentation rate or ESR).  *R. at 157-174, 308-309, 310-311, 312-315.*  Dr. Ramage adjusted Plaintiff's medications as necessary, depending on the disease process and how Plaintiff felt.  On February 11, 1998, Dr. Ramage noted that Plaintiff

---

[4]A sedimentation rate (erythrocyte sedimentation rate or ESR) is a common blood test that is used to detect and monitor inflammation in the body.  The normal sedimentation rate (Westergren method) for males is 0-15 millimeters per hour and for females is 0-20 millimeters per hour. *www.medicinenet.com/sedimentation_rate/article.htm*

was on low dose prednisone[5], methotrexate[6] and naprosyn[7]. *R. at 188.* On January 27, 1999, Dr. Ramage noted that Plaintiff wasn't doing well and prescribed Arava.[8] *R. at 184.* By March 17, 1999, Dr. Ramage noted that after eight weeks on Arava, Plaintiff was "markedly improved" and had no side effects from the drug. *R. at 183.* On July 2, 1999, Plaintiff was doing well on Arava but was worried about potential side effects. Dr. Ramage reassured her and suggested Enbrel might be a drug she could try in the future. *R. at 176.* On September 23, 1999, Dr. Ramage noted that Plaintiff was anemic, possibly due to a gynecological problem, and that made it difficult to assess her rheumatoid condition. *R. at 181.* Plaintiff was to continue Arava, discontinue naprosyn and begin taking prednisone. *Id.* Two months later, on November 22, 1999, Plaintiff was doing well on Arava, prednisone and naprosyn, but was still anemic. *R. at 180.* Plaintiff continued to do well on Arava through July 24, 2000. *R. at 193-195.*

On October 18, 2000, Plaintiff underwent a left breast biopsy and lumpectomy to remove a cancerous mass. *R. at 120-156.* Following surgery, Plaintiff underwent chemotherapy and radiation treatments under the care of Masoud Khorsand, M.D. *R. at 202, 203, 204, 211.* On November 27, 2000, Plaintiff reported to nurse practitioner Buchanan that she was not taking her rheumatoid

---

[5]Prednisone is an oral, synthetic corticosteroid used for suppressing the immune system and inflammation. *www.medicinenet.com/prednisone/article.htm.*

[6]Methotrexate is a anti-metabolite drug which means it is capable of blocking the metabolism of cells. It has been found helpful in treating rheumatoid arthritis, and although the mechanism of action is unknown, it seems to work by altering aspects of immune function which may play a role in causing rheumatoid arthritis. *www.medicinenet.com/methotrexate/article.htm.*

[7]Naprosyn (naproxen) is a non-steroidal anti-inflammatory drug (NSAID) that is used for the management of mild to moderate pain, fever, and inflammation. *www.medicinenet.com/naprosyn/article.htm.*

[8]Arava (leflunomide) is an oral, disease-modifying drug that is used in the treatment of rheumatoid arthritis. Leflunomide reduces the inflammation, symptoms and joint damage caused by rheumatoid arthritis. *www.medicinenet.com/leflunomide/article.htm.*

arthritis medicines because she was taking multiple chemotherapy drugs.  *R. at 192*.  On March 27, 2001, Dr. Ramage noted that Plaintiff had completed chemotherapy and could start back on Arava and prednisone by mid April.  *R. at 179*.  On June 11, 2001, Plaintiff reported that she had not restarted Arava but was taking the low dose prednisone.  *R. at 191*.  Nurse practitioner Buchanan agreed Plaintiff could continue with the prednisone but provided a "loading dose of Arava, if her symptomatology changes and she wants to restart the Arava."  *Id*.  During follow up exams on April 17, 2001 *(R. at 202)*, September 11, 2001 *(R. at 200)*, January 21, 2002 *(R. at 198)* and May 28, 2002 *(R. at 197)*, Dr. Khorsand noted that there was no evidence of recurrence of Plaintiff's breast cancer.

On October 11, 2001, nurse practitioner Buchanan noted that Plaintiff was still taking only prednisone and was doing well.  *R. at 190*.  Plaintiff did not have active disease in her hands and was feeling well.  *Id*.  On January 23, 2002, Plaintiff complained of a sore finger with a rheumatoid nodule and Buchanan injected it with cortisone.  *R. at 189*.  Buchanan encouraged Plaintiff to restart Arava and noted that Plaintiff "goes to Jazzercise every day, which is unusual for an arthritic."  *Id*. Buchanan also noted that Plaintiff was reluctant to start any new medications and was taking herbal remedies to prevent cancer recurrence.  *Id*.  On March 4, 2002, Dr. Ramage noted some confusion with Plaintiff's medications and stated that because Plaintiff had quit the rheumatoid arthritis medications during her chemotherapy, the arthritis had became more active.  *R. at 178*.  Plaintiff was to continue the Arava and prednisone and begin Fosamax for osteoporosis.  *Id*.  On April 18, 2002, Dr. Ramage noted that Plaintiff "has aggressive rheumatoid" and that even with Arava and prednisone there was inflammation.  *R. at 177*.  Dr. Ramage stated that even though Plaintiff  "never complains . . . [s]he has a high sed rate and has some physical findings of chronic and acute disease."  *Id*.  He

considered prescribing a TNF inhibitor but decided against it because of Plaintiff's breast cancer.[9] *Id.* Dr. Ramage injected the third finger on Plaintiff's left hand with Depo-Medrol because of a large cystic lesion and noted that although "[s]he does not a [sic] like the appearance . . . it does not bother her a great deal." *Id.*

On May 9, 2002, Plaintiff consulted James A. Boss, M.D. concerning surgery on her feet due to lumps on her toes and difficulty wearing shoes. *R. at 286-88.* Dr. Boss found that although Plaintiff ambulated with a normal gait *(R. at 286)*, x-rays indicated "[e]arly degenerative changes of the MTP joint of the left great toe with more advance to the right great toe" *(R. at 289)*. Surgery was scheduled at that time but was not done until February 3, 2003. *(R. at 272-273).* Following surgery, Dr. Boss noted that "she is doing amazingly well. Her radiographs would indicate that she should be having quite a bit of pain from arthritis, but she is really not." *(R. at 266).*

On July 24, 2002, Dr. Ramage injected a swollen PIP joint on Plaintiff's left hand but noted that Plaintiff "participates in aerobics and says she does not have any problem doing that. . . . [and] she is happy with her current course." *R. at 175, 307.* Plaintiff was to continue taking Arava and prednisone and to begin taking Synthroid for hypothyroidism. *Id.* On November 13, 2002, Dr. Ramage expressed concern over the active status of Plaintiff's rheumatoid condition, stating

> She never complains, but this lady always has active disease and we are treating her. She is not difficult, but I just worry about her. We are still seeing active disease in her hands. She has some long-term crippling effects and I worry about all of this. She is on Arava and low dose prednisone 5 mg. a day. We have used other drugs and perhaps at some point, depending on the exact situation, we may want to try the TNF drugs although she has not been anxious to do that.

---

[9]Tumor necrosis factor (TNF) is a protein that the body produces when there is inflammation causing fever, pain, or tenderness and swelling of joints. The unchecked inflammation of rheumatoid arthritis eventually leads to destruction of the joints. Drugs such as Humira and Enbrel act as TNF inhibitors and block the process that leads to pain, inflammation and joint damage. *www.medicinenet.com.*

*R. at 306.*  On January 6, 2003, Dr. Ramage stated that Plaintiff was doing pretty well, but needed an injection in the PIP joint of the third finger on her left hand.  *R. at 303, 305.*  On March 5, 2003, Dr. Ramage noted that x-rays of Plaintiff's hands indicated degenerative changes compatible with rheumatoid arthritis.  *R. at 302.*  He also stated she "is a noncomplainer [sic] and a great lady, but I would like to treat her more aggressively. . . [and] I would like her to consider the TNF drugs."  *Id.*

On March 28, 2003, a state agency physician assessed Plaintiff's limitations on the Physical Residual Functional Capacity Assessment form.  *R. at 322-329.*  These findings included some exertional limitations (Plaintiff had the ability to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, and unlimited push and/or pull (including operation of hand and/or foot controls)) *(R. at 323)*; had no postural limitations *(R. at 324)*; some manipulative limitations (Plaintiff had an unlimited (frequent) ability for reaching in all directions (including overhead), unlimited (frequent) ability for handling (including gross manipulation), and unlimited ability for feeling (skin receptors), but had limited (occasional) ability for fingering (fine manipulation)) *(R. at 325)*; no visual limitations *(R. at 325)*; no communicative limitations *(R. at 326)*; and some environmental limitations (Plaintiff was to avoid concentrated exposure to extreme cold and was to avoid all exposure to hazards (machinery, heights, etc.) *(R. at 326)*.  In assessing Plaintiff's limitations, the agency physician included a narrative stating facts that supported his conclusions, including:  Plaintiff was fifty-years old, had a long history of rheumatoid arthritis with symptoms of active synovitis[10] that persisted despite  prescribed treatment,

---

[10]Synovitis is the inflammation of a synovial membrane, especially that of a joint; in general, when unqualified, the same as arthritis.  *Steadman's Medical Dictionary* 1773 (27th ed., Lippincott Williams & Wilkins 2000).

that the medications were adjusted and discontinued during chemotherapy for breast cancer, the synovitis persisted through November, 2002 even though she was taking low dose prednisone and Arava, lab tests were normal except for an elevated sedimentation rate, and that Plaintiff did not appear to meet the listing requirements for 14.09 due to her reasonably full activities of daily living including use of her hands and daily walks for exercise. *R. at 323-324*. The agency physician also noted that Plaintiff's symptoms included increased/decreased synovitis involving the MCP or PIP joints of the hands despite continuous treatment but that Plaintiff retained reasonable function of both hands. *R. at 328*. On June 24, 2003, Plaintiff's residual functional capacity and limitations were affirmed by a second agency physician. *R. at 329*.

On September 5, 2003, Dr. Ramage filled out a Physical Residual Functional Capacity Questionnaire. *R. at 298-301*. Dr. Ramage indicated, *inter alia*, that Plaintiff was in constant pain; was incapable of even "low stress" jobs; could not walk a city block without rest or severe pain; could not stand more than five minutes at one time without needing to sit down; could sit, stand/walk less than two hours total in an 8-hour workday; could never lift and carry even ten pounds; could occasionally look down, turn her head right or left or look up; could never twist, crouch/squat, climb ladders or stairs and could only rarely stoop (bend); had significant limitations with reaching, handling and fingering; had severe limitations due to deformities of both hands including decreased strength and decreased range of motion; and that Plaintiff would likely be absent from work more than four days a month as a result of her impairments. *Id.*

## IV.  Discussion/Analysis

Plaintiff contends that the ALJ erred in evaluating the medical evidence in the record. Specifically, Plaintiff asserts that: (1) the ALJ erred in his evaluation of the treating physician's

medical reports; and (2) the ALJ's flawed evaluation of the treating physician's medical reports rendered the evaluation of the remaining issues equally flawed. Within this framework, Plaintiff raises issues regarding the weight given the treating physician's opinion, the ALJ's duty to clarify and develop the record, the ALJ's evaluation of Plaintiff's credibility, the ALJ's evaluation of Plaintiff's residual functional capacity, and the questions the ALJ posed to the vocational expert (hereinafter "VE"). *See **Memorandum in Support of Plaintiff's Motion to Reverse Administration Decision Or, in the Alternative, a Remand of This Matter** (hereinafter "Memo in Support") (Doc. 10)*. Plaintiff asks for a reversal, or in the alternative, a remand for further development. Defendant argues that the ALJ applied the correct legal standards and correctly determined that Plaintiff is not disabled based on substantial evidence.

## Medical Record

Plaintiff argues that the ALJ erred in his evaluation of the treating physician's report by (1) making statements that are in direct contradiction to the record *(Memo in Support, Doc 10 at 2-3)*; (2) rejecting the treating physician's report *(Id. at 3-5)*; (3) not seeking clarification by contacting the treating physician or further developing the record *(Id. at 5-6)*; and (4) by offering no other evidence *(Id. at 6-7)*.

In an unsuccessful attempt to illustrate the contradictory nature of the ALJ's statement that he had "carefully reviewed all of Dr. Ramage's treatment records and fail[ed] to find any mention of sitting, standing or walking limitations," Plaintiff offers a list of treatment dates and doctor notes. *Memo in Support, Doc. 10* at 2-3. However, items listed as number one through three and five through seven document problems with Plaintiff's <u>hands</u> and do not mention sitting, standing or walking limitations. *Id.* Item four is a treatment note (wherein Dr. Boss notes that Plaintiff ambulates

with a normal gait despite degenerative changes in her joints) and an x-ray report prior to Plaintiff's successful surgery for foot problems.  *See R. at 286, 289.*  List items number eight through fifteen detail Dr. Ramage's opinions as expressed in the Physical Residual Functional Capacity Questionnaire on September 5, 2003 and are inconsistent with the <u>treatment notes</u>, as noted by the ALJ.  *R. at 17.* The ALJ specifically stated that he considered the opinions expressed by Dr. Ramage in Exhibit 7F/1-4 *(R. at 298-301)*[11], the Physical Residual Functional Capacity Questionnaire, and found that the "extreme limitations noted by Dr. Ramage are not consistent with objective findings and are inconsistent even with his own treatment records and progress notes." *R. at 17.*

Under the treating physician rule, the Commissioner generally gives more weight to treating physicians' opinions than to non-treating physicians' opinions. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)).  An ALJ is required to assign the opinion of a treating physician controlling weight if it is both:  (1)  well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) consistent with other substantial evidence in the record. *Watkins v. Barnhart*, 350 F. 3d 1297, 1300 (10th Cir. 2003); Soc. Sec. Ruling 96-2p, 196 WL 374188 (July 2, 1996); 20 C.F.R. § 404.1527(d)(2).  Even if a treating physician's opinion is not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §404.1527 and 416.927." *Watkins*, 350 F.3d at 1300.  The factors to be considered in evaluating a treating physician's opinion include

---

[11]The Court is aware, as noted by Plaintiff *(Memo in Support, Doc. 10* at 5-6), that there is an error in the numbering of exhibits in the administrative record.  Exhibit 7F includes page numbers 298 through 316.  The administrative record pages 300 through 304 are marked Exhibit 7F/3 through 7F/7, and record pages 305 through 309 are also numbered Exhibit 7F/3 through 7F/7.  The two sets of pages identified as Exhibits 7F/1 through 7F/7 are for the most part, not duplicates but are different documents.  (There is one exception, as record page 303, Exhibit 7F/6 and record page 305, Exhibit 7F/3 are duplicates.)  Therefore, the Court will identify any reference to these exhibits by the record page number and not by exhibit number.

the opinion's consistency with other evidence, the length of the treatment relationship, the frequency

of examination, and the extent to which the opinion is supported by objective medical evidence.

*White v. Barnhart*, 287 F.3d 903, 907 (10th Cir. 2001).

"Under the regulations, the agency rulings, and our case law, an ALJ must 'give good

reasons' . . . for the weight assigned to a treating physician's opinion," that are "sufficiently specific

to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

medical opinion and the reason for that weight."   *Watkins*, 350 F. 3d at 1300.  "[I]f the ALJ rejects

the opinion completely, he must then give 'specific, legitimate reasons' for doing so."   *Id*. at 1301

(citations omitted).  A treating physician may offer an opinion that a plaintiff is totally disabled but

"[t]hat opinion is not dispositive because final responsibility for determining the ultimate issue of

disability is reserved to the [Commissioner]."   *Castellano v. Sec'y of Health & Human Serv.*, 26 F.3d

1027, 1029 (10th Cir. 1994); 20 C.F.R. §404.1527(e)(2).

Plaintiff's allegation that the ALJ rejected the treating physician's opinion appears to be based

on the ALJ's rejection of Dr. Ramage's conclusions as expressed in the Physical Residual Functional

Capacity Questionnaire at *R. 298-301*.  However, the ALJ stated that while he considered the opinion

of Dr. Ramage, as expressed in Exhibit 7F/1-4 (the Physical Residual Functional Capacity

Questionnaire, *R. at 298-301*), he gave greater weight to the opinions of other treating and examining

physicians because those opinions were more consistent with other evidence in the record.  *R. at 17*.

The ALJ stated*:*

> [T]he extreme limitations noted by Dr. Ramage are not consistent with objective
> findings and are inconsistent even with his own treatment records and progress notes.
> I have carefully reviewed all of Dr. Ramage's treatment records and fail to find any
> mention of sitting, standing or walking limitations.  There is nothing in the medical
> records to document the ability to sit for only 10 minutes at a time or stand and walk

for less than two hours in an eight hour day.  By her own testimony the claimant is able to take short walks and stand for one hour at a time.

I therefore find that the opinion of Dr. Ramage is not well supported by objective findings and is contrary to other substantial evidence in the record.  Thus, while I am considering the opinion of Dr. Ramage, I give greater weight to the opinions of the other treating and examining physicians in the record as they are more consistent with the claimant's overall daily functioning (SSR 96-2p).

*R. at 17.*

On the Physical Residual Functional Capacity Questionnaire, Dr. Ramage checked boxes indicating, *inter alia*, that Plaintiff was in constant pain, incapable of even "low stress" jobs, unable to walk even one city block without rest or pain, could sit only 10 minutes at a time and stand only 5 minutes at a time and could never lift and carry even 10 pounds.  *R. at 299-300.*  The few written remarks on the form were brief and conclusory and failed to set out objective medical evidence in support of Plaintiff's claims.  *Frey v. Bowen,* 816 F.2d 508, 515 (10th Cir. 1987) ("[E]valuation forms, standing alone, unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence.")  Dr. Ramage's conclusions in this questionnaire are not supported by his treatment notes, wherein Dr. Ramage expressed surprise that Plaintiff did not complain more often *(R. at 177, 183, 306)* and that she participated in an exercise class *(R. at 189, 175).*  Dr. Ramage also did not provide an accompanying report explaining why the opinions in the questionnaire were inconsistent with his treatment notes.

In his decision, the ALJ discussed why he discounted Dr. Ramage's opinion in the Physical Residual Functional Capacity Questionnaire and clearly stated why he concluded that Dr. Ramage's opinion, in that document, was not supported by the objective medical evidence and was "inconsistent even with his own treatment records and progress notes." *R. at 17.*  The Court finds that substantial

evidence supports the ALJ's determination that Dr. Ramage's conclusions in the Physical Residual Functional Capacity Questionnaire were not entitled to controlling weight.

Plaintiff also alleges that the ALJ erred by failing to seek clarification by contacting the treating physician or further developing the record and by offering no other evidence. *Memo in Support*, *Doc. 10* at 5-7. Under the governing regulations the ALJ must recontact a treating physician when the information the doctor provides is "inadequate . . . to determine whether [the claimant is] disabled." 20 C.F.R. § 404.1512(e). It is not the rejection of the treating physician's opinion that triggers the ALJ's duty to recontact the physician, but the inadequacy of the evidence received from the treating physician. *Id.* The ALJ apparently concluded that the information provided by Dr. Ramage was "'adequate' for consideration; that is, it was not so incomplete that it could not be considered." *See White*, 287 F.3d at 908. However, the ALJ also concluded that the conclusions reached by Dr. Ramage in the Physical Residual Functional Capacity Questionnaire were not supported by the record as a whole. The ALJ made this determination because the opinions expressed in the questionnaire were "not well supported by objective findings and [were] contrary to other substantial evidence in the record." *R. at 17.*

While a claimant has the burden of demonstrating that he is entitled to benefits, a social security hearing is a nonadversarial proceeding. *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006). Therefore, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. U.S. Dep't. of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993). "[W]hen the claimant is represented by counsel at the administrative hearing, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's

-15-

claims are adequately explored. . . .  In the absence of such a request by counsel, we will not impose

a duty on the ALJ to order a consultative examination unless the need for one is clearly established

in the record."  *Hawkins v. Chater*, 113 F.3d 1162, 1167-68 (10th Cir. 1997).  During the hearing

before the ALJ, Plaintiff's counsel did not indicate or suggest to the ALJ that any medical records

were missing nor did counsel ask the ALJ for assistance in obtaining additional medical records,

therefore, the ALJ was unaware of a need for further medical examinations.  The Court finds that the

ALJ had no duty to recontact Dr. Ramage or to further develop the record.

### **Credibility**

Plaintiff states that "[b]ecause the ALJ has basically 'tossed' the treating physician's reports,

as voluminous and substantiated as they are, that has rendered the ALJ's evaluation of the remaining

issues equally flawed and fatal."  *Memo in Support, Doc. 10* at 7.  In challenging the ALJ's credibility

evaluation, Plaintiff alleges that the "ALJ improperly substituted his medical opinion and failed to

provide proper (specific) legitimate reasons for the dismissal of Dr. Ramage's reports."  *Id. at 8.*

In evaluating a claimant's subjective symptoms, an ALJ's findings on credibility "should be

closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of

findings."  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quotation omitted).  Thus, the Tenth

Circuit requires an ALJ's credibility finding to be linked to substantial evidence.  *Id.*  However,

"*Kepler* does not require a formalistic factor-by-factor recitation of the evidence;" instead, all that

is required is that the ALJ set forth the specific evidence he relies on in evaluating the claimant's

credibility.  *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).  The Tenth Circuit has also

"emphasized that credibility determinations 'are peculiarly the province of the finder of fact,' and

should not be upset if supported by substantial evidence." *White v. Barnhart*, 287 F.3d 903, 909 (10th Cir. 2001) (quotation omitted).

The ALJ found that the "claimant's allegations, while generally credible do not support a finding of disability." *R. at 19.* The ALJ did not completely reject all of Plaintiff's allegations and acknowledged that Plaintiff had a severe impairment. *R. at 16.* After considering the evidence, the ALJ found that Plaintiff's "testimony and reports of pain and functional restrictions, while generally credible does [sic] not support a finding of disability in this case." *R. at 16.* Plaintiff fails to specify which factors regarding the credibility finding that the ALJ failed to consider or support with evidence, but simply claims the ALJ engaged in improper speculation. *R. at 8.* The Court notes that in his decision, the ALJ discussed many factors, including Plaintiff's testimony *(R. at 16)*, the medical history of her rheumatoid arthritis and the medical evidence supporting that diagnosis *(id.),* the medications Plaintiff takes and their effect on her condition *(R. at 16-17)*, and her activities of daily living *(R. at 17).*

Specifically, the ALJ pointed out that while Plaintiff reported severe disabling hand pain, the "objective findings on clinical examination reveal that her arthritis is fairly well-controlled with medications." *R. at 16.* The ALJ noted that Plaintiff has a long history of severe rheumatoid arthritis in her hands that was confirmed by x-ray studies *(R. at 16)*, but that the doctor only recommended she continue with her medications and "placed no restrictions on [Plaintiff] regarding working, walking, standing, sitting or lifting" *(R. at 17).* The ALJ stated that Plaintiff's medications (Arava, prednisone and steroid injections) helped to keep her condition stable and that Plaintiff testified that her medications help in relieving her pain. *R. at 16-17.* The ALJ also noted that Plaintiff's daily activities have not been significantly affected by her impairment and that Plaintiff continues to

"perform household chores, drive and perform errands and go shopping.  She stated that she goes for short walks and waters her plants and flowers outside. . . . [and] is able to perform all activities of personal hygiene independently. . ."  *R. at 17*.

The ALJ set forth the reasons supporting his negative credibility assessment as required.  The Court will not reweigh the evidence nor substitute its judgment for that of the Commissioner.  *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991) (quotation omitted).  The ALJ's finding that Plaintiff's allegations concerning her symptoms and limitations are generally credible but do not support a finding of disability is supported by substantial evidence in the record.

### Residual Functional Capacity

Plaintiff argues that because of the "total rejection of Dr. Ramage's extensive reports and assessments" *(Memo in Support, Doc. 10* at 8), the ALJ's RFC determination that Plaintiff can perform a significant range of light work is in error.  Plaintiff's exact allegations are difficult to decipher as her statements are vague, conclusory and devoid of any argument tailored to the facts of this case.  Plaintiff's statements consist primarily of case holdings without any reference to facts which describe, or at least identify, the ALJ's alleged errors as they relate to the record in this specific case.

"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).  The ALJ found that Plaintiff had the residual functional capacity to perform a significant range of light work, including:

> the residual functional capacity to perform [a significant range of] light work that allows for a sit/stand option.  She has significant pain in her hands but is able to reach, handle and feel with both hands.  She is not able to do fine fingering or feeling with her hands on a frequent basis.

*R. at 19.*

As noted above, the ALJ found the extreme limitations noted by Dr. Ramage were inconsistent with Dr. Ramage's own treatment notes, inconsistent with the objective findings in the record, and inconsistent with Plaintiff's own testimony that she was "able to take short walks and stand for one hour at a time."  *R. at 17.*  There is no evidence in the record indicating that Plaintiff would be unable to perform a significant range of light work with the restrictions added by the ALJ. While the ALJ could have discussed his assessment of Plaintiff's abilities and the RFC with more clarity and thoroughness, a review of Plaintiff's testimony  and the medical evidence indicates that substantial evidence supports the ALJ's RFC finding.

## Hypothetical Questions Posed to the Vocational Expert

Plaintiff argues that the ALJ failed to include the limitations asserted by Dr. Ramage in the Physical Residual Functional Capacity Questionnaire *(R. at 298-301)* in the hypothetical questions posed to the VE.  *Memo in Support, Doc. 10* at 9.  However, as the Court noted above, the ALJ properly discounted the opinions stated in the questionnaire because the opinions were not consistent with the objective medical evidence and Dr. Ramage's own treatment notes.

Hypothetical questions must reflect a claimant's impairments and his limitations as supported by the evidence in the record. *Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996). Hypothetical inquiries "must include all (and only) those impairments borne out by the evidentiary record." *Evans v. Chater,* 55 F.3d 530, 532 (10th Cir. 1995). "[T]estimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's [now, Commissioner's] decision." *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991) (internal citation and quotation omitted).

At the hearing, the ALJ presented hypothetical questions to the VE based on the RFC and limitations set forth above. Plaintiff appears to argue that the ALJ's hypothetical questions did not adequately reflect Plaintiff's limitations. However, the Court has rejected Plaintiff's challenges to the ALJ's determination that Dr. Ramage's opinion was not entitled to controlling weight and the ALJ's RFC assessment. Because the hypothetical questions posed to the VE included all the limitations that the ALJ included in his RFC assessment, the VE's answers provided a proper basis for the ALJ's disability decision.

## V.  Conclusion

In conclusion, the Court **FINDS** that the Commissioner's decision is supported by substantial evidence in the record as a whole and comports with relevant legal standards. Accordingly, the Court will **AFFIRM** the decision of the Commissioner.

**WHEREFORE, IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** and Plaintiff's *Motion to Reverse Administrative Decision or, in the Alternative, a Remand of Said Decision* (*Doc. 9*)  is **DENIED**.  A final order will be entered concurrently with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

*Lourdes A. Martínez*

**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**